CASE 16—IN EQUITY—OCTOBER 30.

# Earle, &c. vs. Couch.

### APPEAL FROM HOPKINS CIRCUIT COURT.

A voluntary conveyance is good against a subsequent purchaser with actual notice. (1 *Met.*, 346.)

Purchaser of slaves from a party who had obtained a decree for them, and the possession under it—where the decree was subject to be set aside upon a bill of review filed after his purchase—acquired no better title to the slaves than his vendor had. He was a purchaser *pendente lite,* and he and those claiming under him are bound by the proceedings under the bill of review. (4 *Dana*, 95; 9 *B. Mon.*, 228.)

T. A. MARSHALL and J. HARLAN, for appellants, cited 1 *Met.* 346.

JNO. M. HARLAN, for appellee.

JUDGE PETERS DELIVERED THE OPINION OF THE COURT:

On the 4th day of July, 1840, James Armstrong, in consideration of one dollar to him in hand paid by John Q. Thompson, of love and affection for his daughter, Mary F. Couch, and for other good and sufficient consideration thereunto moving from James D. Couch, (as the deed recites it,) conveyed to said Thompson a female slave, Esther, and her two children *"Frances* and *Sam,"* in trust for the use of his said daughter, Mary F. Couch, during her life, and for the support and education of her children, and, at her death, for her children ; but if she left no child, then said slaves were to go to the children of the trustee.

On the same day James D. Couch, in consideration of one dollar and of the said deed of James Armstrong, conveyed all of his interest in his father's estate, and a female slave named Sally, to said Armstrong.

In 1845 Ruby and others, creditors of James D. Couch, filed their bill, setting forth their several demands against him, impeaching his deed to Armstrong. alleging that it conveyed all the property of him, the said Couch, and that it was made to hinder and prevent his creditors from collecting their debts.

Couch and Armstrong were made defendants to the original bill, and Couch, in his answer, admitted that his deed to Arm-

strong was made for the purpose of defrauding his creditors; says he informed Armstrong of his inability to pay his debts, and consulted him upon the subject of conveying his interest in his father's estate and the slave Sally, for the purpose of preventing his creditors from subjecting said interest and said slave to the payment of his debts; that Armstrong advised it, and the deed was accordingly made.

Couch further states in his answer, that although said deed expresses on its face that it was made in consideration of the conveyance of certain property by said Armstrong to John Q. Thompson in trust, &c., that that was not the real consideration for said conveyance; that Armstrong never paid any thing for it, and it was agreed between them that he was finally to have the property conveyed by him to Armstrong.

Armstrong, in his answer, denied that he had any knowledge of any fraudulent intent on the part of Couch; alleges that the transaction upon his part was fair and honest, and entered into from motives of paternal affection. He further states in his answer, that he conveyed four slaves, "Easter, Frances, Sam, and Henry," to Thompson, in trust, &c., in consideration that J. D. Couch had conveyed to him the slave Sally and his interest in his father's estate; makes his answer a cross-bill against John Couch, the infant son and only heir of Mrs. Mary F. Couch, who was then dead, and against the administrator of the trustee, Thompson, he having also died; and "suggests" that if the deed from James D. Couch to him should be adjudged fraudulent, and he should be deprived of the property therein conveyed to him, that his deed to Thompson, the trustee, should be canceled, and he be restored to the slaves therein conveyed.

John Couch answered by guardian *ad litem*, but the administrator of Thompson, the trustee, failed to answer.

John Couch, the only son and heir of the first beneficiary under the deed of trust, was subsequently made a defendant to the suit of Ruby, &c., against James D. Couch, &c., and answered by the same guardian *ad litem*.

James D. Couch's deposition was taken upon the part of Ruby, &c., and was read upon the trial without objection,

in which he repeated substantially the statements made in his answer.

On the 13th of September, 1850, a decree was rendered, by which both of said deeds were set aside, the amounts due from James D. Couch to the complainants were ascertained, their payment ordered, and, in case of his failure, his interest in the estate of his father, which he had previously conveyed to Armstrong, was to be subjected to their payment. The slaves which had been conveyed by Armstrong to Thompson, the trustee, were ordered to be taken by the sheriff and delivered over to Armstrong, and it is most probable they were delivered to him on the same day the decree was rendered. Very soon after their delivery to him, Armstrong sold the slaves; indeed, on the same day upon which the decree was rendered, as is shown by his bill of sale, he sold the girl Frances to John L. Woolfolk. S. C. Woodson sold the slave Charles to Givens on the 1st of January, 1851, and in his answer says he purchased him of James Armstrong in 1850, leaving the day and the month blank.

On the 8th day of May, 1858, John Couch, the infant son of Mrs. M. F. Couch, and sole beneficiary in the deed of trust from Armstrong to Thompson, by his next friend filed his bill of review against the executor of James Armstrong, (he having died,) and the various purchasers of the slaves deriving title through him, to review and vacate said decree so far as it affected his interests.

All the defendants, who had any of the slaves in possession, answered the bill of review, and, some of those who were not the immediate vendees of Armstrong made their answers cross-petitions against those of whom they purchased, asking judgments against them upon their warranties, in case the slaves should be recovered of them.

Holland, in his answer, alleges that he purchased the woman Esther and two female children of A. G. Wooldridge at the price of $1,000, which he had paid; charges that Wooldridge had purchased them of John B. Earle, and asks for a judgment against A. G. Wooldridge upon his warranty of title, and that he may be substituted to his remedy against said Earle,

Wooldridge's immediate vendor, if he should lose the slaves; he insists that he is an innocent purchaser, *"without notice"* of plaintiff's claim, and should be protected, and files his bill of sale from Wooldridge to him, which bears date the 17th of March, 1851.

Thomas K. Givens, in his answer, states he purchased the slave Charles of S. C. Woodson on the 1st day of January, 1851, for the sum of $375, and says that he knew of no error in the decree referred to, and denies that there is any ; he filed with his answer his bill of sale from Woodson, and asks a judgment against Woodson if the slave should be taken from him.

J. B. Earle, in his answer, denies that said decree is erroneous, or that he had any *notice of any error in said decree if it existed;* says that J. L. Woolfolk purchased the slave Frances from James Armstrong, and gave her to his wife, who is a daughter of said Woolfolk, and that he had had her in his possession since about the 13th of September, 1850, since which time she had given birth to two children, and he had held them adverse to the claim of appellee and all others; relies upon the statute of limitations, and refers to the answer of Woolfolk, which he asks may be considered as part of his; and, although it is expressly charged that he was the counsel of James Armstrong in defending the original suit, must have been apprised of the errors in said decree, and of the insufficiency of Armstrong's title to said slaves, he wholly fails to respond to that charge.

Woolfolk, in his answer, says he purchased the slave Frances on the 13th of September, 1850, after the decree was rendered, and after the slaves were delivered to Armstrong, for the price named in the bill of sale, which he paid, and gave her to his daughter, Mrs. Earle; he does say he was an innocent purchaser for a good and valuable consideration ; but he does not say that he was ignorant of the nature of Armstrong's claim—that he could not have stated, because it is apparent from his answer that he was apprised of the decree, and that Armstrong got the slaves in possession under said decree.

Wooldridge and Earle have not answered Holland's cross-petition.

The court below, upon the hearing, set aside the former decree, and opened the case so far as the infant John Couch's interests were involved, from which Earle and others have appealed.

It is contended, upon the part of appellants, that the deed from Armstrong to Thompson, trustee, was voluntary, and therefore fraudulent and void as to them, they being purchasers from Armstrong without notice of his former voluntary conveyance.

If it be admitted that said conveyance was voluntary, what is the condition of appellants, and how does it affect their title? To the extent that they or any of them are purchasers with *actual* notice of the existence of said conveyance, it is conclusive upon them.

Armstrong, in his answer to the original bill, refers to said deed, and professes to file it as an exhibit with his answer; it was filed, and appellant, Earle, was Armstrong's counsel in that case. It does not appear that he had any other counsel; no counsel is marked to the answer, but appellee emphatically charges that he was Armstrong's counsel in the case, and was fully aware of the "*insufficiency*" of Armstrong's title. This charge is unanswered, and must be regarded as true; he is the son-in-law of Woolfolk, who purchased Frances for his wife on the same day the decree was rendered, and on that day gave her to his daughter. Woolfolk and Earle both carefully confine their want of notice to any error in the decree; they do not however deny that they had notice of the conveyance. Actual notice is fixed upon Earle beyond cavil, and the relation which he bore to Wooldridge, the object of Wooldridge in making the purchase, the time when it was done, and his failure to allege in his answer that he had no notice of said conveyance, force the conviction upon the mind that they both were well informed upon the subject, and knew that Armstrong's title to the slaves was doubtful and unreliable. They were not deceived, and do not occupy the attitude of *bona fide* purchasers, but seem rather to have combined with Armstrong to defraud appellee. Regarding them, then, as having *actual* notice of the conveyance, although it may have been volun-

tary, they were not prejudiced by the decree. (*Enders vs. Williams*, 1*st Met.*, 346.)

But, another question, materially affecting the interest of all the appellants, is presented, and that is, are they to be regarded as purchasers *pendente lite?*

At the time the original decree was rendered, the appellee was an infant, and was an infant when the bill of review was filed. The several purchases were made by appellants between those two periods. Said decree was, when they made their purchases, liable to be reviewed and set aside upon a bill of review, or reversed by suing out a writ of error.

In *Clarey, et al. vs. Marshall's heirs*, (4 *Dana*, 95,) this court held, that a purchaser of a tract of land, from a party who had obtained a decree, and a conveyance of the land from a commissioner appointed by the court for the purpose, which decree was set aside upon a bill of review filed after his purchase, acquired no better title to the land than his vendor had; that he was a purchaser *pendente-lite*, and bound by the proceedings under the bill of review. In *Debell vs. Foxworthy*, (9 *B. Mon.*, 228,) the question was again decided in the same way. And no reason is perceived why the same rule should not prevail in the case in hand.

The vendees of Armstrong do not stand in the attitude of purchasers under a decree of the court; they voluntarily bought of him what he had an ostensible judicial right to; they did not buy under the authority of the court, or any officer of the law; they bought his title, and took it subject to all the contingencies to which it was liable.

Wherefore, the decree is *affirmed.*